**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---

KATHLEEN STONE,

        *Plaintiff,*

    v.

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE, and JOHN AND
JANE DOES 1-50,

        *Defendants.*

Civ. No. 1:24-cv-11897-LTS-JCB

---

**PLAINTIFF KATHLEEN STONE'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT PRESIDENT AND FELLOWS OF HARVARD
COLLEGE'S MOTION TO DISMISS**

**NESENOFF & MILTENBERG, LLP**

**Andrew T. Miltenberg, Esq. *(pro hac vice)***
**Gabrielle M. Vinci, Esq. *(pro hac vice)***
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
**amiltenberg@nmllplaw.com**
**gvinci@nmllplaw.com**

**Tara J. Davis, Esq. (BBO No. 675346)**
**Regina M. Federico, Esq. (BBO No. 700099)**
**101 Federal Street, Nineteenth Floor**
**Boston, Massachusetts 02110**
**(617) 209-2188**
**tdavis@nmllplaw.com**
**rfederico@nmllplaw.com**

**INTRODUCTION**

Plaintiff Kathleen Stone ("Plaintiff" or "Coach Stone") respectfully submits this memorandum of law in opposition to defendant President and Fellows of Harvard College's ("Defendant's" or "Harvard's") Motion to Dismiss. Coach Stone, a world-renowned figure in women's coaching and former head coach of Harvard's Women's Ice Hockey team, commenced this action after being unlawfully targeted and forced out of employment. Over the course of her tenure at Harvard, Coach Stone amassed an impressive and historical record, leading her team to over 500 victories and becoming a record-breaking symbol in women's coaching nationwide. At the same time, Coach Stone routinely fought for equality within athletics and, specifically, pay equity between female and male coaches at Defendant's institution.

Despite her uncontestably impressive record and years of dedication to Harvard, Defendant quickly and unapologetically turned its back on Plaintiff after malicious and, as admitted by Harvard, erroneous accusations arose targeting Coach Stone in the media. Rather than support Coach Stone, as Harvard had unfailingly done for male coaches in similar circumstances, Harvard joined the campaign against Plaintiff and ultimately forced Coach Stone to prematurely end her record-breaking tenure at Harvard.

Accordingly, Coach Stone commenced this action asserting claims of gender discrimination, a hostile work environment, and retaliation against Harvard. Through its motion, Harvard attempts to skirt liability by misconstruing Plaintiff's allegations and artfully ignoring the well-pleaded facts in Plaintiff's Complaint, to argue that this matter should be dismissed. For the reasons set out in detail below, Defendant's motion should be denied.

## STATEMENT OF FACTS

Plaintiff respectfully refers the Court to Plaintiff's Complaint[1], filed July 23, 2024, and Plaintiff's Affidavit[2], filed contemporaneously herewith, for a full recitation of the facts and circumstances underlying the present action. For the Court's convenience, a high-level summary:

## I.    Head Coach Stone's Unprecedented Tenure with the Women's Ice Hockey Team.

Coach Stone commenced her employment as Harvard's head coach of the Women's Ice Hockey team during the 1994-1995 season. Cmpl, ¶ 26. During her tenure at Harvard, Coach Stone cemented herself as a preeminent figure in college athletics and led the Harvard Crimson to over 500 victories and multiple titles. *Id.* at ¶ 28. Coach Stone's impressive record as Harvard's Women's Ice Hockey coach resulted in her being named the all-time "winningest" female coach in women's college hockey. *Id.* at ¶ 30. Throughout her career, Coach Stone strived to create, maintain, and foster an environment of trust, dignity, and respect between herself and her players, and prioritized the physical, emotional, and mental well-being of the students on her team beyond just what the student athletes could do on the ice. *Id.* at ¶¶ 31-32.

## II.    Coach Stone Joins the Fight to Achieve Pay Equity at Harvard.

Throughout her tenure at Harvard, Coach Stone was notoriously underpaid vis-à-vis her male counterpart, Harvard's male head coach of the Men's Ice Hockey team. Stone Aff., ¶¶ 3-4, Cmpl., ¶ 35. In or around the beginning of 2017, in anticipation of a change in Massachusetts law, Coach Stone, together with other female coaches at Harvard, began to fiercely advocate for pay transparency and parity between male and female coaches at Harvard. Stone Aff., ¶ 5, Cmpl., ¶¶ 33-34. To that end, Coach Stone had numerous conversations with various members of Harvard's

---

[1] All references to allegations in Plaintiff's complaint are cited herein as "Cmpl. __".
[2] All references to facts in Plaintiff's affidavit are cited herein as "Stone Aff. __".

Athletics Department ("Athletics") and administration regarding Harvard's anticipated efforts to bring compensation levels of male and female coaches into compliance with the new law. *Id.*

Following those 2017 conversations, in or around June of 2018, Harvard introduced a new model for coaches' compensation. Cmpl., ¶¶ 36. However, this new model raised more questions than answers, and Plaintiff, together with her fellow female coaches, continued to raise concerns and place pressure on Defendant to reach pay equity amongst the male and female coaching staff. *Id.* In response to the efforts of female coaches, Harvard's administration admitted that the new model did not reach pay equity, would not reach pay equity, and there was nothing further Defendant intended to do to reach pay equity. *Id.* at 37. Unwilling to accept that answer, Plaintiff continued to advocate for gender equality and pay parity between herself (and her fellow female coaches) and Harvard's male coaches. Stone Aff., ¶¶ 5-9.

To that end, Coach Stone continued to have routine discussions with numerous Harvard administrators regarding issues of pay disparity between male and female coaching staff and gender discrimination within Athletics. *Id.* Specifically, from 2020 through her forced retirement in 2023, Plaintiff spoke at length to Harvard's administration regarding gender inequality within Athletics, each time reiterating her prior discussions and pleas for Harvard to correct the inequality. *Id.* at ¶¶ 6-9. Although some changes were made, they were still insufficient to place Coach Stone and her fellow female coaches on equal footing to their male counterparts and Coach Stone continued her advocacy for gender equality through the end of her employment with Harvard. *Id.* at 6-9, 12; Cmpl., at ¶¶ 37-44.

### III.    Harvard Refuses to Support Plaintiff Against Malicious and False Allegations of Coaching Misconduct and Chooses to Join the Campaign Against Coach Stone.

On or about March 5, 2022, while addressing her team in the locker room, Coach Stone used the phrase "too many chiefs and not enough Indians." Cmpl., at ¶ 47. Immediately, Plaintiff

paused and apologized to her players for her choice of words. She further went out of the way to apologize to players and staff who were not even in the locker room when the phrase was said. *Id.* at ¶¶ 47-48. Plaintiff further self-reported the incident to her supervisor, Tim Troville. *Id.* at ¶ 49.

Following the locker room incident, Coach Stone learned of a two-prong investigation by Harvard into the Women's Ice Hockey program and, specifically, Coach Stone's behavior as head coach. *Id.* at ¶ 45. First, a complaint was lodged with Harvard's Human Resources Department by Plaintiff's then-assistant coach stemming from the locker room incident. *Id.* at ¶¶ 47-50. Second, the investigation stemmed from purported negative comments from data collected from Harvard's Mercer Study (the "Study"), a survey conducted by Defendant to gauge the student-athletes' satisfaction with all aspects of their athletic experience at Harvard, the specific feedback of which were kept confidential from Coach Stone. *Id.* at ¶¶ 51-52, 56-57. At the conclusion of the dual investigation, Coach Stone was found **not** to have created in a toxic work environment or otherwise engaged in unprofessional conduct. *Id.* at ¶ 62. Still, in an effort to improve player-coach communications and other issues raised in the Study's player feedback, Harvard placed Coach Stone on a performance improvement plan ("PIP"). *Id.* at ¶¶ 63-67. Following the issuance of the PIP, however, Harvard did little, if anything, to support Coach Stone or otherwise assist in her endeavors to meet the goals of the PIP, thus leaving Coach Stone on her own to address this feedback, which she did with very favorable responses from both the players and her administration. As most successful coaches do, Coach Stone was always open to learning and improving how she coached, communicated with, and related to her team. *Id.* at ¶ 67.

On or about October 24, 2022, Plaintiff learned of an article being run in *The Boston Globe* regarding Plaintiff and allegations of misconduct against her. *Id.* at ¶ 68. Plaintiff immediately notified Tim Troville of the forthcoming article. *Id.* at ¶ 74. Thereafter, on or about January 18,

2023, Coach Stone met with Athletic Director, Erin McDermott ("McDermott"), Harvard's Press Secretary, and Harvard's General Counsel to discuss the anticipated article. *Id.* at ¶ 77. During the meeting, Coach Stone was strongly advised not to respond to or otherwise engage with the article's author, or defend herself in any way. *Id.* at ¶ 78. Rather, Harvard impressed upon Plaintiff that they would take the lead to respond to the author's inquiries in Coach Stone's defense as the article, in Harvard's view, was nothing to be concerned about in light of Plaintiff's storied record as head coach. *Id.* at ¶¶ 78-79.

*The Boston Globe* published their article concerning Coach Stone on January 27, 2023[3]. *Id.* at ¶ 80. Following release of the article, Coach Stone met again with McDermott and expressed her desire to publicly defend herself and respond to the article's untrue allegations. *Id.* at ¶¶ 82, 85. Again, Harvard strongly discouraged Coach Stone from responding in any way. *Id.* at ¶¶ 85-86. During the meeting with McDermott, Coach Stone remarked that had she been a man, she would not have been treated in the same manner which, shockingly, McDermott agreed with, stating that the situation would not be happening to a men's coach. *Id.* at ¶¶ 83-84.

For weeks, Coach Stone was left in limbo as Harvard refused to allow her an opportunity to defend herself. *Id.* at ¶¶ 85-86. Then, in March of 2023, Harvard initiated a second investigation

---

[3] Harvard relies heavily on *The Boston Globe* article in its moving papers and argues that the Court may consider the contents of the article in its determination of Defendant's Motion to Dismiss as the article was referenced in Plaintiff's Complaint and the article is subject to judicial notice. While the fact that the article exists may be subject to judicial notice, Plaintiff disagrees that the statements within the article, namely the allegations of misconduct against Plaintiff, are subject to judicial notice and should not be read for the truth of the matters asserted therein. Plaintiff vehemently disputes the statements and allegations of misconduct against her in the articles and such unproven allegations cannot be granted judicial notice under Fed. R. Evid. 201(b). *See Total Petroleum Puerto Rico Corp. v. Torres-Caraballo*, 672 F. Supp. 2d 252, 254-55 (D.P.R. 2009). *See also, Rivera v. Marriott Int'l, Inc.*, 456 F. Supp. 3d 330, 337–38 (D.P.R. 2020) (citing *Starbrands Cap., LLC v. Original MW Inc.*, 2015 WL 13691435 at *4 (D. Mass. Aug. 14, 2015), *report and recommendation adopted*, 2015 WL 5305215 (D. Mass. Sept. 11, 2015) (holding that the contents of website may be subject to judicial notice to establish that the information was public, "it would be inappropriate … to take judicial notice of th[e] material for the purpose of establishing the truth of its contents.").

against Plaintiff related to another article in *The Athletic*[4], in addition to *The Boston Globe* article and allegations that Coach Stone had permitted hazing and bullying by her more senior players on the Ice Hockey Team. *Id.* at ¶¶ 88-89. At no point in time did Coach Stone ever know of any hazing or bullying happening by her team and any time any behavioral concerns came to light, Coach Stone immediately responded, looked into all concerns, and reported these incidents—even if unsubstantiated—to her athletic administration. *Id.* at ¶¶ 90-92. At all times, Coach Stone demanded an environment of respect from her players on the team and tolerated nothing less. *Id.*

Coach Stone was shocked that she would be investigated for the alleged actions of her players that she had no knowledge of. Instead of launching investigations, Harvard repeatedly shielded male coaches from repercussions for any alleged misconduct of their men's teams and respective male players. *Id.* at ¶¶ 93-118. Moreover, Harvard had routinely tolerated behaviors akin to those Plaintiff had been accused of so long as they emanated from male coaches who were permitted, if not expected, to "be tough" and coach their players "hard" which included using profanity and other behaviors Harvard would define as "abusive" had they come from a female coach. *Id.* Harvard essentially initiated an investigation into Plaintiff for her players' alleged bad behavior and her audacity to act in the same manner as her male colleagues. *Id.* at ¶¶ 93-118, 124-130. Plaintiff fully cooperated with Harvard's unwarranted investigation, all the while being handcuffed by Harvard to respond to the mounting media against her under the guise that Harvard would handle the press and take care of her. *Id.* at ¶¶ 120-122.

---

[4] Similar to Defendant's reliance on the contents of *The Boston Globe* article, consideration of the contents of *The Athletic* article for the truth of the matters asserted therein would be improper. *See Starbrands Cap., LLC v. Original MW Inc.*, 2015 WL 13691435 at *4.

IV.     **Coach Stone is Left in Shambles.**

Approximately two months later, and before the official announcement of Harvard's findings in the investigation, Harvard advised Plaintiff that it did not intend to bring her back for the 2023-2024 season, essentially terminating Plaintiff's employment effective at the end of the 2022-2023 academic year. *Id.* at ¶ 124. Faced with the ultimatum of retire or be terminated, she chose to save what dignity Harvard had left her and prematurely retired from her position. *Id.* at ¶ 125. Unbelievably, following the public announcement of Coach Stone's forced early retirement, Harvard publicly released the conclusion of the investigation, finding she had **not** engaged in misconduct nor "fostered a culture of hazing" as she had been accused of doing. *Id.* at ¶¶ 126-127.

Despite having been cleared of the wrongdoings alleged against her, the damage had already been done. Coach Stone endured months of public, professional, and personal torment as she was repeatedly attacked in the media without a means or permission from her employer to respond, and thereafter attacked by her employer and forced to leave her storied career behind despite Harvard's knowledge that Coach Stone had done nothing more than what she was hired to do—coach her team to success. *Id.* at ¶¶ 131-132.

## ARGUMENT

I.     **Legal Standard Applicable to Defendant's Motion.**

To survive a motion to dismiss, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," with "enough detail to provide a defendant with 'fair notice of what the … claim is and the grounds upon which it rests.'" *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 11-12 (1st Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007)). The factual allegations in the complaint must "be enough to raise a right to relief above the speculative level, … on the assumption that all the allegations in the complaint are true

(even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. at 556. In assessing whether a complaint has met this standard, the court "must accept as true all well-pleaded facts 'indulging all reasonable inferences in [the plaintiff's] favor.'" *Fantini v. Salem State Coll.*, 557 F.3d 22, 26 (1st Cir. 2009) (quoting *Nisselson v. Lernout*, 469 F.3s 143, 150 (1st Cir. 2006)). "Dismissal is **only** appropriate when the complaint fails to allege a plausible entitlement to relief." *Rodriguez-Ortiz v. Margo Caribe, Inc.*, 490 F.3d 92, 95 (1st Cir. 2007) (emphasis added).

Specifically, in employment discrimination cases such as this, "it is not necessary for a plaintiff to plead facts supporting each element of a claim, provided that whatever facts are pled allow the Court to plausibly infer liability." *Sisco v. DLA Piper, LLP.*, 833 F.Supp.2d 133, 140 (D. Mass. 2011). The Supreme Court has repeatedly held "a complaint in an employment discrimination lawsuit [need] not contain specific facts establishing a prima facie case of discrimination" and Court does "not require[e] heightened fact pleading of specifics [of employment discrimination], but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, at 547 (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002)).

## II.  <u>Defendant's Motion to Dismiss Should be Denied in its Entirety.</u>

### A. <u>Plaintiff's Claims are Timely and Allegations Occurring Beyond the Statute of Limitations May Be Considered by the Court in Support of Plaintiff's Claims.</u>

#### i.  <u>Plaintiff's Discrimination and Retaliation Claims.</u>

Defendant argues that Plaintiff's discrimination and retaliation claims are subject to a 300-day statute of limitations under Massachusetts General Laws Chapter 151B ("Chapter 151B") and Title VII of the Civil Rights Act of 1964 ("Title VII"), precluding Plaintiff's claims based upon actions occurring prior to March 9, 2023. Plaintiff acknowledges that her claims are subject to a

300-day statute of limitations but, for the reasons set forth herein, maintains that all actions alleged by Plaintiff may be considered timely even if they occurred outside the statute of limitations.

It is well settled in the discrimination context that "[i]f a continuing violation is shown, a plaintiff is entitled to have a court consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred." *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001). A continuing violation may be found "where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Fitzgerald v. Henderson*, 251 F.3d 345 at 359. *See also*, *Rae v. Woburn Pub. Schs.*, 113 F.4th 86, 104 (1st Cir. 2024) (citing *Noviello v. City of Boston*, 398 F.3d 76, 87 (1st Cir. 2005) (opining that a continuing violation will be found where, at a bare minimum, the plaintiff pleads "a series of discriminatory acts that emanate from the same discriminatory animus")). The continuing violation is properly applied where a plaintiff has sufficiently pled a "systemic violation [rooted] in a discriminatory policy or practice; so long as the policy or practice itself continues into the limitation period, a challenger may be deemed to have filed a timely complaint." *Jensen v. Frank*, 912 F.2d 517, 523 (1st Cir. 1990). Under Massachusetts law, for the continuing violation doctrine to apply, "the claim must be one that arises from 'a series of related events that have to be viewed in their totality in order to assess adequately their discriminatory nature and impact[.]'" *Shervin v. Partners Healthcare Sys., Inc.*, 804 F.3d 23, 34-35 (1st Cir. 2015) (quoting *Cuddyer v. Stop & Shop Supermkt. Co.*, 750 N.E.2d 928, 936 (Mass. 2001)). In such a case, "the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." *Id.* (internal quotation marks omitted).

Moreover, a claim of hostile work environment is considered timely so long as one act contributing to the claim occurred within the statutory period; if it did, "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). Notably, Massachusetts courts specifically recognize a hostile work environment as one of the types of claims for which application of the continuing violation doctrine is appropriate. *See e.g.*, *Rae v. Woburn Pub. Schs.*, 113 F.4th 86, 102 (1st Cir. 2024).

Harvard argues that Plaintiff's claims cannot be saved by the continuing violation doctrine for two reasons: (i) Plaintiff has not alleged a hostile work environment; and (ii) the incidents alleged represent discrete acts which are each separately actionable and cannot be linked together to trigger the continuing violation doctrine. Harvard misses the mark with both arguments.

First, Plaintiff *has* alleged a hostile work environment. As alleged in Counts I and II of the Complaint, Harvard's discriminatory actions and inactions "subjected Plaintiff to an atmosphere of adverse employment actions and decision based upon her gender" which "severely affected the terms and conditions of [Coach Stone's] employment…". Cmpl., at ¶¶ 137, 147. Harvard's misreading of Plaintiff's claims to assert that there is no claim for a hostile work environment is unpersuasive[5]. Coach Stone has alleged a hostile work environment and thus, the continuing violation doctrine should apply. *See Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 18 (1st Cir. 2002).

Second, Plaintiff has alleged sufficient facts to adequately plead a "discriminatory policy or practice" and a "series of discriminatory acts emanating from the same discriminatory animus" sufficient to apply the continuing violation doctrine at this early pleading stage. Specifically,

---

[5] Harvard makes no substantive argument that Plaintiff has not pled a hostile work environment but merely states that she has not included such a claim in her pleading. Havard's failure to address Plaintiff's hostile work environment claim in its moving brief precludes any argument that she has failed to sufficiently plead such an acclaim on reply.

Coach Stone has alleged that Harvard, inter alia: (i) instituted a policy and practice of underpaying female coaches vis-à-vis their male counterparts, even admitting that Harvard would never bring female and male coaches into pay equity, Cmpl., at ¶¶ 33-44; Stone Aff. ¶¶ 4-9; (ii) refused to defend Coach Stone in the face of, as Harvard would later admit, meritless accusations of misconduct and hazing, Cmpl., at ¶¶ 62, 82-88, 122-23; (iii) refused to allow Coach Stone to defend herself against such allegations under the guise of allowing the moment to pass with Harvard's full support behind Coach Stone, *Id.*; (iv) placed Coach Stone on a PIP without any support based, at least in part, on information and alleged feedback not readily shared with Coach Stone, *Id.* ¶¶ 63-67; (v) investigated Coach Stone for what alleged behaviors readily permitted, if not praised, by Harvard when performed by male coaches, *Id.* ¶¶ 93-119; (vi) while investigating Coach Stone, Plaintiff continued to repeatedly and zealously raise concerns regarding gender and pay inequities at the institution, Stone Aff. ¶¶ 5-12; and (vii) ultimately turned its back on Coach Stone and forced her early retirement, under threat of termination, despite having previously and routinely turning a blind eye to acts of actual misconduct by male coaches, *Id.* ¶¶ 93-119, 124-130.

Harvard implores the court to look at each of the incidents alleged in the Complaint as standalone acts to find that the continuing violation doctrine should not apply. However, the totality of the circumstances demonstrates that all of the acts alleged in the Complaint, both inside and outside of the statute of limitations, "was of a continuing nature and substantially relate[d] to" timely allegations of discrimination and retaliation. *See Nelson v. Town of Westminster*, 2024 WL 4250221, at *9-10 (D. Mass Aug. 30, 2024). Accordingly, the incidents leading to Plaintiff's forced early retirement, a timely claim as admitted by Defendant, cannot be viewed in a singularly in a vacuum but must be looked at *in toto* as they are part and parcel of the exact "series of discriminatory acts" necessitating implementation of the continuing violation doctrine.

Moreover, contrary to Harvard's position, the incidents leading up to Coach Stone's forced early retirement are, arguably, not of the nature that a reasonable person would have "kn[own] or reasonably should have known that her work situation was pervasively hostile and **unlikely to improve**." *Nelson v. Town of Westminster*, 2024 WL at 10 (emphasis added). Indeed, at all times throughout the process until the very end when Harvard forced Plaintiff to retire, Harvard acted as if it were in full support of Coach Stone and her continued employment with the institution. Cmpl., at ¶¶ 62, 82-88, 122-23. As alleged in the Complaint, Harvard advised Plaintiff that it would defend her and handle any media related to, as Harvard admits, the unfounded allegations against her and would support her moving forward in her continued career with the institution. *Id.* Such acts cannot be said to have "triggered [Plaintiff's] awareness and duty to assert her rights" where it was not clear from Defendant's own actions that the situation was unlikely to improve until Harvard took the ultimate step to force Coach Stone out of employment. *See Cuddyer v. Stop & Shop Supermkt. Co.*, 750 N.E.2d at 942. Accordingly, Defendant's arguments regarding the timeliness of Plaintiff's claims should be rejected and the continuing violation doctrine should apply.

Even if the court determines that the continuing violation doctrine does not apply in this case, the facts relating to events that occurred prior to the statute of limitations may still be considered by the court in determining Plaintiff's timely discrimination claims. *Burnett v. Ocean Properties, Ltd.*, 327 F.Supp.3d 198, 232 (D. Me. 2018); *Philip v. City of New York*, 2012 WL 1356604, at *6 (E.D.N.Y. 2012) ("The other alleged discriminatory acts (e.g., derogatory gestures and disparate treatment) though not actionable in themselves, may nevertheless be cited as evidence in support of plaintiff's timely claim (for example, as evidence of pretext) even if they fall outside the statute of limitations"). As the U.S. Supreme Court has made clear,

> The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about

> related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. **Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.**

*National R.R. Passenger Corp. v. Morgan*, at 113 (emphasis added). In deference to the Supreme Court's ruling in *Morgan*, courts in this Circuit have considered otherwise untimely incidents as support and background for timely filed claims in discrimination and retaliation lawsuits. *See Lima v. Middlesex Sheriff's Office*, 2020 WL 823088, at *5 (D. Mass Feb. 19, 2020); *Smith v. City of Boston*, 2013 WL 3874733, at *12, n. 16 (D. Mass. July 24, 2013).

Here, the facts and circumstances leading up to Plaintiff's uncontestably timely claim, Plaintiff's forced early retirement, serve, at a minimum, as background and context for Harvard's gender-based decision to treat her differently than her male colleagues. As such, this Court should follow suit and, in the event any part of Plaintiff's discrimination and retaliation claims are deemed untimely, still consider the untimely incidents as background and support for the timely adverse actions. *See Waldner v. Natixis Investment Managers, L.P.*, 2024 WL 4002674, at *30-31 (D. Mass. Aug. 21, 2024) (finding that "[e]vidence concerning events that … are outside the statute of [limitations] may be relevant and admissible" to cinsoder when assessing plaintiff's timely claims and events."); *Ayala v. Shineski*, 780 F.3d 52, 57 (1st Cir. 2015) (opining that consideration of the entire scope of allegations supporting a timely discrimination claim, including behavior alleged outside the statutory time period, is permissible for purposes of assessing liability).

### ii. Plaintiff's Equal Pay Act ("EPA") and Massachusetts Act to Establish Pay Equity ("MEPA") claims.

Harvard argues that Plaintiff's MEPA and EPA claims are subject to a three- and two-year statute of limitations, respectively, and any claims falling outside of that time period should be dismissed by the court. Again, Plaintiff does not dispute that her MEPA and EPA claims are subject

to the relevant statute of limitations. However, Plaintiff disputes that her EPA claims are subject to a two-year statute of limitations and further maintains that, similar to her discrimination and retaliation claims, the Court may, at a minimum, consider untimely incidents of pay discrimination suffered by Plaintiff in support of Coach Stone's timely claims for relief.

The EPA imposes a two-year statute of limitations to bring suit which may be extended to three years for a "willful violation." 29 U.S.C. §255(a). Defendant argues that Plaintiff has not set forth allegations charging Harvard with a willful violation of the law and, therefore, only the two-year statute of limitations should apply. However, a cursory reading of the Complaint proves Defendant wrong. Specifically, Plaintiff has alleged: (i) Harvard knowingly failed to pay female and male coaches equally, Cmpl., at ¶¶ 33-44 and (ii) admitted that it would not bring male and female coaches into pay parity, despite mandates from the State and Federal law to do so, resulting in the continued unjustified underpayment of female coaches. *Id.* at ¶¶ 37-44. Based on a fair reading of Plaintiff's Complaint, Plaintiff has alleged that Harvard engaged in a willful violation of the law by knowingly underpaying Coach Stone vis-à-vis her male counterpart without an intention to correct such underpayment, and the three-year statute of limitations should apply.

Moreover, contrary to Defendant's position, the Court may apply the continuing violation doctrine to Plaintiff's EPA and MEPA claims under the Lilly Ledbetter Fair Pay Act (the "LLFPA"). The LLFPA amended Title VII to state, in relevant part,

> [A]n unlawful employment practice occurs, with respect to discrimination in compensation …, when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice. 42 U.S.C. 2000e-5(e)(3)(A).

Under the LLFPA, "'a new cause of action for pay discrimination ar[ises] every time a plaintiff receive[s] a paycheck resulting from an earlier discriminatory compensation practice' – even one that 'occurr[ed] outside the statute of limitations period'". *Tourangeau v. Nappi Distributors*, 648 F.Supp.3d 133, 206 (D. Me. 2022) (quoting *Kellogg v. Ball State Univ.*, 954 F.3d 525, 529 (7th Cir. 2021). Although the First Circuit Court has not yet ruled on application of the LLFPA, courts within this circuit have limited the reach of the Act to where an employer is "paying different wages or providing different benefits to similarly situated employees." *Tourangeau v. Nappi Distributors*, 648 F.Supp.3d at 206 (internal quotation marks omitted) (finding that because the plaintiff's gender discrimination and EPA claims regarded "ongoing pay discrepancies", the claim could "not be considered unattached from the pay she has received from [defendant] since 2015" and holding that the continuing violation doctrine applied to the plaintiff's EPA claim).

Similar to the plaintiff in *Tourangeau*, Coach Stone has alleged that she suffered gender-based discrimination in compensation and ongoing pay discrepancies based upon her gender dating back to, at a minimum, 2017. Coach Stone's EPA and MEPA claims cannot be considered separate from the pay she received throughout her career with Harvard as the chronic and deliberate underpayment of female coaches, such as Plaintiff, is the very discriminatory compensation practice the LLFPA is designed to attack and rectify. Accordingly, similar to the court's finding in *Tourangeau*, the continuing violation doctrine should apply to Plaintiff's EPA and MEPA claims in this action as they "fall precisely within he scope of the [LLFPA]." *Tourangeau*, at 206.

Finally, for the reasons stated *supra*, should the court determine that the LLFPA and continuing violation doctrine do not apply to Plaintiff's EPA and MEPA claims, the facts relating to events that occurred prior to the statute of limitations may still be considered by the court in determining Plaintiff's timely discrimination claims. *See e.g., Burnett v. Ocean Properties, Ltd.*,

327 F.Supp.3d 198, 232 (D. Me. 2018); *Waldner v. Natixis Investment Managers, L.P.*, 2024 WL 4002674, at *30-31 (D. Mass. Aug. 21, 2024). Based on the foregoing, the continuing violation doctrine should apply to Plaintiff's claims and, even if the Court finds that the continuing violation doctrine does not apply, the Court may still properly consider the multiple discriminatory acts alleged in the Complaint as further support for Plaintiff's timely causes of action.

### B.  Coach Stone Has Plausibly Pled a Claim for Gender Discrimination.

To establish a *prima facie* claim of discrimination, Plaintiff must demonstrate that: (i) she is a member of a protected class; (ii) she was qualified for her position; (iii) she was subjected to an adverse employment action; and (iv) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See Frith v. Whole Foods Mkt., Inc.*, 517 F. Supp. 3d 60, 70 (D. Mass. 2021), *aff'd on other grounds,* 38 F.4th 263 (1st Cir. 2022).

Notably, Plaintiff's burden of proof in a discrimination action is "light" at the *prima facie* stage and courts are cautioned against "treat[ing] the *prima facie* case, 'a flexible evidentiary standard,' as a 'rigid pleading standard,' requiring [the plaintiff] to establish each prong of the *prima facie* case to survive a motion to dismiss. *Rae v. Woburn Pub. Schs.*, 113 F.4th 86, 109 (1st Cir. 2024) (citing *Garayalde-Rijos v. Mun. of Carolina*, 747 F.3d 15, 24 (1st Cir. 2014)); *Stratton v. Bentley Univ.*, 113 F.4th 25, 45 (1st Cir. 2024). Defendant maintains that these claims must fail because the Complaint fails to plead an inference of discrimination sufficient to establish that Harvard forcing Plaintiff's retirement was based on gender discrimination and not the allegations of misconduct against Plaintiff in the media. Defendant's arguments should be rejected.

To survive a motion to dismiss, the facts pled must "raise a plausible inference that an 'invidious discriminatory purpose was a motivating factor' in the challenged decision. *Pataud v. U.S. Citizenship & Immigr. Srvs. Bos. Field Off.*, 501 F.Supp.3d 22, 28-29 (D. Mass. 2020). *See*

*also*, *Williams v. Palladia, Inc.*, 2009 WL 362100, at *7 (S.D.N.Y. Feb. 10, 2009) (opining that an inference of discrimination can be established "from which a rational fact finder could infer that [the employer's actions] were motivated by [her protected characteristic].")

Notably, the standard used to establish an inference of discrimination is a "flexible evidentiary standard" (*Young v. Brennan*, 2017 WL 1843696, at *5 (D. Mass. May 8, 2017)) that can be "satisfied differently in differing factual scenarios." *Ellis v. Century 21 Dep't Stores*, 975 F.Supp.2d 244, 271 (E.D.N.Y. 2013). Therefore, courts recognize that most plaintiffs must rely on circumstantial evidence. *See Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000). Examples of evidence that may demonstrate the requisite discriminatory motive include, but are not limited to, "a disparate impact on a particular group, '[d]epartures from the normal procedural sequence,' and 'contemporary statements by member of the decisionmaking *[sic]* body.'" *Pataud v. U.S. Citizenship & Immigr. Srvs. Bos. Field Off.*, 501 F.Supp.3d at 29 (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977)). *See also*, *Sethi v. Narod*, 12 F.Supp.3d 505, 536 (E.D.N.Y. 2014) (quoting *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) (opining that a plaintiff alleging discrimination based upon a protected characteristic can demonstrate an inference of discrimination through many means, including "the employer's … more favorable treatment of employees not in the protected group or the sequence of events leading to the plaintiff's [adverse employment action.]").

Here, Plaintiff has adequately pled an inference of discrimination sufficient to withstand Defendant's motion to dismiss. Plaintiff has pled that even in the face of false allegations against her, Harvard treated her less favorably than male coaches in similar circumstances. Cmpl., at ¶¶ 93-130. Specifically, Plaintiff alleged that she became the target of false allegations of misconduct allegedly perpetrated by herself and her team. *Id.* at ¶¶ 45-51, 62, 68-91. In response, Harvard

immediately initiated an investigation against Coach Stone, leading to her forced retirement from her position as head coach under threat of termination. *Id.* at ¶¶ 88-130.

As alleged in Plaintiff's Complaint, Harvard's swift and adverse conduct towards her stood in stark contrast to its response in similar circumstances involving male coaches. *Id.* at ¶¶ 93-130. When players on teams coached by male employees, namely the men's soccer team coached by a male employee, were accused of misconduct similar to that alleged to have been done by the female ice hockey players, the male coaches were not investigated and held responsible for the players' actions as Coach Stone was. *Id.* at ¶¶ 103-09. Rather, the male coaches were held apart from their players. *Id.* Furthermore, when male coaches were accused of misconduct or engaged in abusive behavior towards their players, Harvard either ignored the behavior altogether (*Id.* at ¶¶ 94-100, 102) or steadfastly refused to engage in any remedial or disciplinary action for a prolonged period of time, thereby permitting the misconduct to continue for years as opposed to its swift action in investigating and thereafter forced Plaintiff into a premature retirement. *Id.* at ¶¶ 110-19.

Moreover, Plaintiff has pled that at least one of the administrators overseeing the investigation and situation involving Plaintiff and the false allegations against her, McDermott, admitted that had Coach Stone been male, the circumstances and the treatment Plaintiff received would have been vastly different. *Id.* at ¶¶ 80-84. Based on the foregoing, Defendant's motion to dismiss Plaintiff Title VII and Chapter 151B discrimination claims should be denied.

### C. Plaintiff Has Plausibly Pled a Claim for Retaliation under Title VII and Chapter 151B[6].

To plausibly allege a claim for retaliation, a plaintiff must plead (1) that [she] engaged in an activity that is protected by the statute; (2) that [she] suffered an adverse employment action;

---

[6] Notably, Plaintiff asserted a claim for retaliation under the EPA and MEPA in Claim V of her Complaint. Cmpl., at ¶¶ 165-173. Harvard did not seek dismissal of Coach Stone's retaliation claims under these statutes in its moving brief.

and (3) a causal link between the protected activity and the adverse employment action. *See Rivera-Colon v. Mills*, 635 F.3d 9, 12 (1st Cir. 2011)); *Psy-Ed Corp. v. Klein*, 459 Mass. 697, 707 (2011).

Defendant argues that Plaintiff's retaliation claims under Title VII and Chapter 151B must fail because Plaintiff has not plausibly alleged protected activity or a causal link between Plaintiff's repeated and ongoing complaints regarding gender discrimination and her forced retirement in 2023. Defendant's arguments should be rejected. An employee engages in protected activity if she has "opposed any practice made an unlawful employment practice" under Title VII or Chapter 151B. *Fantini v. Salem State Coll.*, 557 F.3d 22, 32 (1st Cir. 2009) (citing *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996)). "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination and encompasses a myriad of conduct, including, but not limited to, "formal charges of discrimination…making complaints to management,…protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges. *Fantini v. Salem State Coll.*, at 32. *See also*, *Ray v. Ropes & Gray, LLP.*, 799 F.3d 99, 107-08 (1st Cir. 2015); *Rodriguez-Vives v. P.R. Firefighters Corps of P.R.*, 743 F.3d 278, 283-84 (1st Cir. 2014).

Here, Plaintiff has plausibly alleged that she engaged in protected activity by repeatedly opposing gender-based pay disparities inherent in Harvard's unequal pay for male and female coaches and for complaining of the unequal treatment she received during the investigations against her. Compl., at ¶¶ 33-44, 80-84. Harvard cannot say to have not known about such complaints as one of Harvard's own administrators *agreed* with Coach Stone that she was being treated differently because she is a woman. *Id.* at ¶¶ 83-84.

Additionally, as outlined in Plaintiff's Affidavit, she engaged in ongoing conversations with Harvard's administration protesting against the unequal treatment of male and female sports

teams, as well as the gender inequality in coaches' compensation. Stone Aff., ¶¶ 5-12. Such conversations continued throughout Coach Stone's career and continued through her forced retirement in 2023. *Id.* Accordingly, Plaintiff has plausibly pled engagement in protected activity.

Further, "an inference of causation may be appropriate where there is close temporal proximity between protected activity and an adverse action." *Stratton v. Bentley Univ.*, 113 F.4th 25, 45 (1st Cir. 2024). Here, Defendant argues that Plaintiff's 2017 and 2018 discussions regarding pay disparity in coach compensation is too attenuated to have a causal connection to Plaintiff's forced retirement, i.e., termination, in 2023. This argument ignores Plaintiff's statements during the investigations that she was being treated differently due to her gender. Cmpl., at ¶¶ 83-84. It also ignores that Plaintiff participated in numerous discussions with Harvard's administration in which she opposed not only the unequal pay between male and female coaches, but also the unequal treatment of female sports' teams as compared to males' sports. Stone Aff., ¶¶ 5-12. Such discussions continued throughout her career and, indeed, occurred throughout the investigations against her in 2022 and 2023. *Id.* Accordingly, Plaintiff's engagement in protected activity followed close in time by her forced separation of employment; therefore, the Defendant's motion to dismiss should be denied.

## CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss should be denied, and Plaintiff should be awarded such other relief as the Court deems just and proper. To the extent that this Court may be inclined to dismiss any claim, such dismissal should be without prejudice and with leave to amend.

[signature page follows]

**Dated: November 18, 2024**
        **Boston, Massachusetts**

              Respectfully submitted,

              **NESENOFF & MILTENBERG, LLP**

              *Attorneys for Plaintiff Kathleen Stone*

              **By:** /s/ *Andrew T. Miltenberg*
              **Andrew T. Miltenberg, Esq.**
              *(pro hac vice)*
              **Gabrielle M. Vinci, Esq.**
              *(pro hac vice)*
              **363 Seventh Avenue, Fifth Floor**
              **New York, New York 10001**
              **(212) 736-4500**
              **amiltenberg@nmllplaw.com**
              **gvinci@nmllplaw.com**

              **By:** /s/ *Tara J. Davis*
              **Tara J. Davis, Esq. (BBO No. 675346)**
              **Regina M. Federico, Esq. (BBO No. 700099)**
              **101 Federal Street, Nineteenth Floor**
              **Boston, Massachusetts 02110**
              **(617) 209-2188**
              **tdavis@nmllplaw.com**
              **rfederico@nmllplaw.com**

### <u>CERTIFICATE OF SERVICE</u>

I certify that on November 18, 2024, this document was filed through the ECF System of the United States District Court for the District of Massachusetts and will be served electronically on the Registered Participants in the notice of Electronic Filing.

*/s/ Andrew T. Miltenberg*
Andrew T. Miltenberg
